NO. 07-00-0203-CR
NO. 07-00-0204-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

JULY 24, 2001

_____


DAVID MICHAEL GRISWOLD, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE COUNTY CRIMINAL COURT AT LAW NO. 15 OF HARRIS COUNTY;

NOS. 9939029 AND 9939030; HONORABLE JEAN HUGHES, JUDGE

_____

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

Presenting four issues which he says require reversal, appellant David Michael Griswold challenges his conviction of managing the All Star News & Video, 3415 Katy Freeway, Houston, "an adult bookstore" without a valid manager's permit and, while acting as an operator of an adult arcade, allowing an obstructed view of an adult arcade from the manager's station in violation of City of Houston Ordinance No. 97-75. His punishment,

assessed after a bench trial, was by confinement in the Harris County Jail for a period of 180 days, probated for a period of one year and, in addition, in each case a $250 fine was assessed together with court costs. In his four issues, appellant contends 1) and 2) because the arcade in question was not an adult arcade, the evidence is insufficient to prove any violation of the ordinance, and because 3) and 4) the definitions of "enterprise," "primary business," and "adult arcade" are unconstitutionally vague and overbroad, the evidence is legally insufficient to support his conviction. For reasons we later recount, we must reverse the judgment of the trial court and enter an acquittal in each case.

Because it is necessary to a proper discussion of the issues presented, we will first review the evidence in the case. The State's first witness, Sergeant David Lovett, a 22-year veteran of the Houston Police Department [HPD], testified that he was assigned to the "vice" division of the force, which investigates prostitution, public lewdness, indecent exposure, and liquor violations. He averred that one of his duties was to investigate sexually oriented businesses to determine whether they were in violation of any city ordinances. Prior to the filing of the charges of which appellant was ultimately convicted, Lovett, on June 21, 1999, went to the All Star News and Video Emporium. At the time of this visit, Lovett met appellant. His trip to that establishment was part of "an ongoing investigation . . . regarding their sexually oriented business for permits and also numerous complaints of indecent exposure and public lewdness." At the time, appellant was the only employee in the business and was operating the cash register and the entrance counter. These facts led the officer to conclude that appellant was the "manager" of the business.

2

Lovett noticed that there was "an assortment of adult pornography tapes, videos, magazines, as well as some nonpornographic material. Also some vibrators, sex lubes and jells." After completing his investigation and consulting other officers at the scene, Lovett discussed some potential violations of the ordinance with appellant. According to Lovett, "[w]e advised him of the unobstructed – unobstructed view from the manager's station to the adult arcade. We advised him of wall penetrations inside the adult arcade, and we also advised him of the manager's license."

Lovett averred that to be in compliance with the ordinance, appellant must be able to view customers anywhere within the business itself, which he could not do because the arcade portion had plywood walls and an electric entrance door which could only be opened by pushing a button behind the counter. Presumably, appellant could not go through the door because he could not push the button and walk through the door at the same time. The arcade portion to which the door led was to an area in which a patron goes into a booth and watches a movie from a selection of pornographic or nonpornographic movies. When asked about the "wall penetrations," Lovett explained they are "pre-drilled holes inside the booth that are used by patrons for anonymous sex." Finally, Lovett testified on that occasion he watched other officers videotape the establishment and give appellant a warning for ordinance violations, and that appellant signed the warning indicating that he understood its contents.

Then, the State turned the focus of its examination of Lovett to September 6, 1999, the date appellant was arrested on the charges giving rise to his conviction. Because of a complaint from a concerned parent who complained that her son had visited "the All Star News at 3415 Katy Freeway and had gone into the arcade section and apparently had been involved in oral sex." On that date, Lovett said, he arrived at the location, paid a $6.00 fee, and entered the arcade section. There were no patrons in the video rental portion of the store but, he testified, as he entered the arcade portion, he "observed approximately 25 'porn' patrons in the back, and [he] observed two of these patrons to be masturbating." He said he paid the $6.00 entrance fee to appellant because he was the only employee present that night. Lovett estimated that only about 5% of All Star's inventory was nonpornographic and 14 of the 36 movie channels available were not pornographic.

With regard to whether All Star was a sexually oriented business, Lovett was cross-examined repeatedly about what he believed would constitute a "primary" business. Lovett averred that in making his determination of whether a store is a sexually oriented business, he looks "at the total picture of the store, what is offered to customers. I look at the arcade section, see what type of movies are available for viewing. I look at the primary business. I don't – I cannot give you just a simple answer of one item versus another." When queried whether he had any guidelines as far as a certain percentage of adult content that would make a store's business sexually oriented, he admitted he did not have any such guidelines. Lovett also testified that All Star ran an ad in an adult bookstore trade

4

publication which featured the fact that it had an "[a]ll new super huge movie arcade with over 30 different titles."

Officer Shipley, the State's second witness, testified that he had been to that All Star location approximately 50 times over the past three or four years. When he entered All Star's premises on September 6, 1999, he did not see any patrons in the video rental section. He, too, paid the $6.00 admission fee to appellant, who "buzzed" him into the arcade section. Shipley pointed out that the door to the arcade section was electronically controlled, and he believed appellant was the manager that night because he was the only employee there and was in charge of the premises. He also described the arcade portion of All Star and noted that appellant could not see into that portion of the store.

As he walked into the arcade, Shipley noticed four or five men "just leaning up and walking around." As he walked through the arcade, Shipley noticed about 20 to 25 patrons. More specifically, he described those patrons as participating in a "stalking-type ritual" which meant "[t]hey're looking for anonymous partners for sex." He added that some patrons "would motion us into the rooms or they would stand in the rooms masturbating and then motion us, you know, or make reference to have us come in and join them, that type of activity." He also observed two wall penetrations in the cubicles.

Shipley videotaped the premises that day, which was received into evidence. He said appellant did not present a permit authorizing him to act as the manager of a sexually oriented business and that he never saw such a permit. Another officer, Officer Williams,

5

also paid the $6.00 fee and was admitted to the arcade portion by appellant. He also said that appellant's view into the arcade was "obstructed by plywood and Sheetrock wall," and "upon going into the video booths, it was noted there was a 'glory hole' or a wall penetration between the two booths." He said that three of the arcade patrons were arrested for indecent exposure and, when asked if he knew what was going on back there, appellant replied that he "didn't want to know . . . and he tried not to go back there."

Officer Robert Foulis testified that a business known as Houston All Star News, located at the same address as All Star, had unsuccessfully applied for a sexually oriented business permit in April of 1997 on two occasions. The first application was denied because of a failure to meet certain "signage" [sign] requirements and free standing building color requirements. The second application was denied because of certain residential density requirements. Foulis said that All Star previously had a permit, but when the ordinance was changed, it lost it. He also said that appellant had no manager's permit and had never applied for such a permit. He also pointed out that in order to obtain a manager's permit, "[a]ll you need is two passport-type photos, valid governmental issued Id with a picture and a $29 money order and not to have been convicted of any of, like, 1 of 13 crimes within the last 5 years."

During his presentation of the case, appellant testified and said he was "definitely not the manager." In describing a typical day at work, he averred the "[f]irst thing I do would be to check in with the previous clerk as far as making sure that the bank is in order.

6

We have a set amount in the bank. I check the bank, and as long as that is in order, the previous clerk signs off on it. I sign it also, it's deposited and then I take over the shift." According to him, All Star has a hired crew to do the janitorial work and he spent most of his time behind the counter. He said that because of the electronic door it would be "virtually impossible" for him to go into the arcade area and he had no reason to go in. He averred that he never ordered inventory or stocked the shelves of All Star. He said that he was paid $6.00 per hour without benefits.

Michael Allen Foster, an employee of All Star's owner, Campus Investments, testified that approximately 40 percent of the videos All Star stocks are adult and that less than 40 percent of the written material they stock are adult material. He did not include magazines such as Playboy, Penthouse, and Gallery as adult material because they "are sold everywhere." Foster observed that All Star was in the business of buying, selling, and trading magazines and videos. He stated that there are 42 arcades or "mini-theaters" at All Star and that there are 17 channels in the first two hallways and in the back two hallways there are 36 channels. Each "mini-theater" has its own video player and the movies are changed out so that more than 60 percent are non-adult. Foster opined that out of the 36 channels, usually 20 were non-adult and 16 were adult "depending on if there's a VCR broke or not broke." He also said that he is the only one with a key to change out videos. He also admitted that if there were 25 customers in different arcades at the same time, all 25 could watch the same movie. He believed that between 65 and 70 percent of the lobby floor area was allocated to non-adult materials. When questioned

7

as to what other merchandise All Star carries, Foster testified "sexual aids, lubricants, contraceptives, some vibrators, toys, gag gifts, fuzzy handcuffs. We sell just about everything you could imagine. Aspirins, just a lot of stupid things." Foster conceded that when an item is rung up on the cash register, there is no way to tell whether it was adult or non-adult because only the price is entered.

Appellant also called Police Lieutenant Douglas Larry Smith, who had been with the vice department for about 15 years. Defense counsel's questioning of him focused on testimony Smith had given at a trial in 1995 and his reference there to the term "50/50 store" which meant 50 percent adult merchandise and 50 percent non-adult. If the adult material was less than 50%, the store did not need a permit. He described some of the standards he used in determining whether a business is sexually oriented. Specifically, whether more than 50 percent of their stock is X-rated, as well as what items generated the store's business and the square footage of the business. Smith also stated that, to his knowledge, there were no written criteria within his command explicating standards by which a police officer could follow in arriving at the 50/50 store determination.

During cross-examination by the State, Smith explained that the ordinances themselves served as written guidelines. In determining whether a business is sexually oriented, "[w]e look for several things. We look at the – the particular things that they have for sale or for rent, merchandise. The clientele, we look for clientele that's going into the business. We look for – we also look in the area of have they – did they have a sexually

oriented business permit in the past. Things such as that." Smith said the police are "looking for a good faith effort [of] what the business is actually . . . doing." He admitted that the officers would make an "eyeball estimate" about what is being sold. Calculating a store's revenue from sexually oriented material as opposed to other merchandise would be very hard to do, but that it might be done in the case of a store that is a "close call." Smith had visited All Star "a couple of times" and, in his opinion, it was clearly a sexually oriented business and "wouldn't be a close call."

Chapter 243 of the Local Government Code empowers cities to regulate sexually oriented businesses. In relevant part, it defines a sexually oriented business as:

> . . .a sex parlor, nude studio, modeling studio, love parlor, adult bookstore, adult movie theater, adult video arcade, adult movie arcade, adult video store, adult motel, or other commercial enterprise the primary business of which is the offering of a service or the selling, renting, or exhibiting of devices or any other items intended to provide sexual stimulation or sexual gratification to the customer.

Tex. Local Gov't Code Ann. § 243.002 (Vernon 1999).

In carrying out this authority, the city enacted its ordinance number 97-75. The ordinance defines "manager," "sexually oriented enterprise," and "adult bookstore" as follows:

> **Manager.** Any person who supervises, directs or manages any employee of an enterprise or any other person who conducts any business in an enterprise with respect to any activity conducted on the premises of the enterprise, including any "on-site manager."

9

Houston City Ordinance No. 95-75 § 28-251.


**Enterprise.** An adult bookstore, adult cabaret, adult encounter parlor, adult lounge, adult modeling studio, adult movie theatre or any establishment whose primary business is the offering of a service or the selling, renting or exhibiting of devices or any other items intended to provide sexual stimulation or sexual gratification to its customers, and which is distinguished by or characterized by an emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas.

**Adult Bookstore.** An establishment whose primary business is the offering to customers of books, magazines, films, or videotapes (whether for viewing off-premises or on-premises by use of motion picture machines or other image-producing devices), periodicals, or other printed or pictorial materials which are intended to provide sexual stimulation or sexual gratification to such customers, and which are distinguished by or characterized by an emphasis on matter depicting, describing or relating to specified sexual activities, or specified anatomical areas.


Houston City Ordinance No. 97-75 § 28-121.


*Adult arcade* . . . any premises that is subject to regulation under Chapter 243 of the Local Government Code, as amended, to which members of the public or members of any club, group or association are admitted and permitted to use one or more arcade devices.

*Arcade device* . . . any coin- or slug-operated or electronically or mechanically controlled machine or device that dispenses or effectuates the dispensing of entertainment, that is intended for the viewing of five (5) or fewer persons in exchange for any payment of any consideration.

*Entertainment shall mean*:

1) Any live exhibition, display or performance; or

2) Any still picture(s) or movie picture(s), whether mechanically, electrically or electronically displayed; or

3) Any combination of the foregoing, in which the <u>specified anatomical areas or</u> specified sexual activities are depicted.

Houston City Ordinance No. 97-75 § 28-81.

In his first issue, appellant challenges the sufficiency of the evidence to sustain a holding that All Star was an adult bookstore, and that appellant served as a manager. In his second issue, appellant argues the evidence is insufficient to prove All Star was an adult arcade or that appellant acted as an operator of an adult arcade. Because these issues are so closely related, we will consider them together. The standards governing our review of legal and factual sufficiency challenges are now so well established as to be axiomatic and it is not necessary to reiterate them here. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and *Clewis v. State*, 922 S.W.2d 126 (Tex.Crim.App. 1996). Suffice it to say that we must first determine whether the evidence is legally sufficient and, if it is not, render a judgment of acquittal. *Id.* at 133. If the evidence is legally sufficient, we must then determine if it is factually sufficient when measured by the standard explicated in *Clewis*. *Id.*

The evidence which we have set out in some detail is ample to sustain the trial judge's finding that All Star is both an adult bookstore and an adult arcade. The question then presented is whether the evidence is sufficient to sustain a finding that appellant was acting as a manager/operator of All Star within the purview of the ordinance. The evidence is undisputed that at the time in question here, appellant was the only employee present

11

and was operating the cash register and the electronic control admitting patrons to the arcade.

The very recent decision of the 14th Court of Appeals in *Pedraza v. State*, 34 S.W.2d 697 (Tex.App.–Houston [14th Dist.] 2000, no pet.) is instructive in interpreting the ordinance. In that case, the court was also presented with the question of whether the evidence was sufficient to sustain a finding that the appellant was an "operator" of an adult arcade. The court of appeals noted the trial evidence concerning Pedraza was 1) he was the only person working behind the counter, and 2) he was "in charge" of the arcade while [the police officer] was there. *Id*. at 700.

En route to reversing the conviction, the appellate court viewed the ordinance as a whole and, in particular, the detailed requirements the "operator" must comply with in order to obtain a permit. *Id.* at 699. After doing so, it commented that it was clear that in the ordinance, the city intended an operator to mean more than a clerk or an employee who simply minds the store, and concluded that the trial evidence was legally insufficient to show that Pedraza possessed "managerial control" such that he was an operator as that term is defined in the ordinance and was really nothing "more than a mere clerk." *Id.* at 700.

Here, the evidence was very similar to that before the *Pedraza* court. As was the case in *Pedraza*, we can conclude that appellant was only a clerk who minded the store and whose responsibilities were not sufficient make him a "manager" as the term is defined

12

in the ordinance.[1]  Appellant's first two issues must be, and are, sustained.  That action nullifies the necessity for a discussion of appellant's remaining two issues.

Accordingly, the judgments of the trial court are reversed, and judgment rendered acquitting appellant of the offenses of which he was convicted.  Tex. R. App. P. 43.2(c).

John T. Boyd
Chief Justice

Do not publish.

---

[1]As did the *Pedraza* court, we note that the ordinance does place a duty on employees and agents of the arcade to keep the view unobstructed.  However, the State did not charge appellant as an employee or agent and that question is not before us.